IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-40697
cons. w/ No. 95-40784
_____


DAVIS LOSADA,

                                        Petitioner-Appellant,

        versus

GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, INSTITUTIONAL DIVISION,

                                        Respondent-Appellee.

_____

Appeal from the United States District Court for the
Southern District of Texas
(87-CV-141)
_____

August 14, 1996
Before KING, GARWOOD and WIENER, Circuit Judges.[*]

GARWOOD, Circuit Judge:

        Petitioner-appellant Davis Losada (Losada) appeals the

district court's dismissal of his petition for writ of habeas

corpus challenging his Texas capital murder conviction and death

sentence.  Losada contends that: (1) the district court failed to

hold an evidentiary hearing on his ineffective assistance of

counsel claim; (2) the state trial court failed in its duty to

_____

[*]     Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

inquire into the possibility of a conflict of interest; (3) he received ineffective assistance of counsel because his attorney was burdened by an impermissible conflict of interest; and (4) the district court's findings regarding his attorney's cross-examination of the state's primary witness are clearly erroneous. We affirm.

**Facts and Proceedings Below**

On March 27, 1985, Losada was indicted for capital murder, committing murder in the course of aggravated sexual assault, in connection with the rape and beating death of Olga Lydia Perales (Perales) in Cameron County, Texas. Losada was represented at trial by court-appointed attorney Jose Luis Peña (Peña).

The evidence adduced at trial concerning Perales' death and the testimony of the state's principal witness, Rafael Leyva, Jr. (Leyva), was accurately summarized by the district court below as follows:

> "Testimony at trial showed that the body of fifteen year old Olga Lydia Perales was found on the morning of December 24, 1984, in a brushy area near San Benito. Perales had been raped and then beaten and stabbed. A pathologist testified that the cause of death was several severe blows to the head which caused a skull fracture. In addition Perales had been stabbed two times in the chest but the pathologist testified that since there was very little internal bleeding from these wounds, the victim was probably already dead when stabbed.
>
> . . . .
>
> The state's principal witness was Rafael Leyva, Jr. Leyva testified that on the night of the murder he had been driving around, drinking and smoking marijuana with

2

Joe Cardenas, Jesse Romero and [Losada]. They were in Joe Cardenas' car. The group eventually ended up at Ray Amaya's house. When they got to Amaya's house, they saw him coming out of a shed in his backyard. Amaya told them that he had Olga Lydia Perales in the shed and they were having sex. After talking with Amaya for a few minutes, someone said something about taking Perales home. Amaya called Olga Lydia out of the shed. She came out and spoke with Amaya and then she got into Cardenas' car. According to Leyva, he was sitting in the back seat along with [Losada]. Joe Cardenas was in the driver's seat beside Romero and Olga Lydia was sitting next to the passenger door in the front seat. Before they started driving away Jesse Romero pushed Olga Lydia's head down between her knees and told her not to make any noise. When Olga Lydia resisted, Jesse Romero pulled out a knife, held it to her neck and told her to shut up. Cardenas drove out into the country and stopped the car. [Losada] remained in the back seat and ordered Olga Lydia to climb in the back seat. Olga Lydia's clothing was removed and, although Olga Lydia pleaded with the quartet to let her go, she was repeatedly raped. Initially she was raped by [Losada]. Then she was forced to commit oral sodomy on [Losada] while first Jesse Romero and then Leyva had anal intercourse with her. Although Cardenas did not have intercourse with Olga Lydia, Leyva testified that he saw Cardenas sticking some object inside Olga Lydia while she was performing oral sodomy on [Losada]. When everyone else was finished, [Losada] raped Olga Lydia two more times, once in the back seat of the car and once on the top of the trunk lid. After the group had finished it was decided that they had to do something to keep Olga Lydia from going to the police. Cardenas pulled a pipe out of the car and handed it to Leyva. Everyone told Leyva to hit Olga Lydia with it as they had to make sure she did not tell anyone what had happened. Leyva testified that he did not want to hit Olga Lydia so he asked her if she would promise not to tell anyone. She immediately did so. He told the others that she had promised not to tell anyone but they all insisted that he hit her. Leyva argued with the others for several minutes while Olga Lydia pleaded that she would not tell anyone. Leyva testified that suddenly his mind went blank and he took the pipe and hit Olga Lydia on the right side of the head. Immediately thereafter Jesse Romero grabbed the pipe and began striking Olga Lydia. The pathologist testified that she was probably struck 20 to 30 times about the head and shoulder. Leyva testified that when the blood began squirting out of Olga Lydia's

3

head, he turned away but he could still hear the others beating her with the pipe. After the beating stopped, [Losada] stabbed her once in the chest. Leyva and Jesse Romero drug the body into the brush and Leyva stabbed her one more time in the chest. The group then got back in Cardenas' car and left the area. During the trip back to San Benito, they threw the knives out of the car window and stopped on the bridge and threw the victim's clothing into a creek."

At trial, the district attorney elicited additional testimony from Leyva on direct examination indicating that his attorney (Barrera) had negotiated a plea agreement in return for his testimony allowing Leyva to plead guilty to a charge of sexual assault carrying a maximum sentence of twenty years on the condition that he testify truthfully at Losada's trial. The district attorney further confronted Leyva with the fact that in his initial statement to the authorities he had indicated that he had been involved only in the rape, but had not confessed to his role in either beating or stabbing Perales. Leyva testified that he had not told the investigator these things in his initial statement because he "wanted to protect [himself]." Finally, the district attorney brought out Leyva's prior criminal history of runaways and burglaries as a juvenile.

On cross-examination, Peña asked only the following questions of Leyva:

"Q:  Mr. Leyva, I was reading your statement here and it says here that at the time of the rape you stated that you did not know who the girl was at that time; is that correct?
 A:  Sir, I didn't hear you.
 . . . .
 Q:  BY MR. Peña: Mr. Leyva, I was reading one of

4

> the paragraphs in your confession, your statement, and it says here somebody was raping the girl and that you, at this time, you didn't know who the girl was; is that correct?
>
> A: Yes, Sir.
> Q: You didn't know who she was?
> A: No, Sir."

The jury found Losada guilty of the capital offense, and following a punishment hearing and the submission of special issues to the jury, Losada's punishment was assessed at death. Losada's conviction and sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals. *Losada v. State*, 721 S.W.2d 305 (Tex. Crim. App. 1986). Losada did not seek *certiorari* review by the United States Supreme Court. On February 5, 1987, the trial court set Losada's execution for March 12, 1987. On March 2, 1987, Peña filed a state habeas petition on Losada's behalf. The trial court recommended that relief be denied without holding an evidentiary hearing. The Texas Court of Criminal Appeals issued a stay of execution and ordered that an evidentiary hearing be held on the claim that a court security officer who also served as a witness in the trial had been in impermissible contact with the jury in violation of *Turner v. Louisiana*, 85 S.Ct. 546 (1965). Following an evidentiary hearing by the trial court, the Texas Court of Criminal Appeals denied Losada's writ without written order. *Ex Parte Losada*, No. 16,892-01 (Tex. Crim. App. 1987).

Losada's execution was then scheduled for July 6, 1987. On July 1, 1987, Peña filed a habeas petition on Losada's behalf in

5

the United States District Court for the Southern District of Texas, Brownsville Division, and applied for a stay of execution. The district court granted a stay of execution, allowed Losada to file an amended petition, and appointed new counsel. Losada's amended petition was filed by his new counsel on October 16, 1987. Respondent moved to dismiss for failure to exhaust state remedies and the district court granted the motion, dismissing Losada's petition and vacating the stay of execution.

Losada's execution date was again set for March 22, 1989. On March 10, 1989, Losada, through his new counsel, filed a second state habeas petition. The trial court recommended that the petition be denied, and the Texas Court of Criminal Appeals denied relief by written order entered March 17, 1989, stating that "none of the allegations made by applicant in his current writ application have any merit." *Ex Parte Losada*, No. 16, 892-02 (Tex. Crim. App. 1989).

On March 20, 1989, Losada, through his new counsel, filed a second federal habeas petition and an application for stay of execution. In this habeas petition, Losada asserted, *inter alia*, that he received ineffective assistance of counsel because his trial attorney had briefly represented Leyva, the state's primary witness, prior to Leyva's arraignment. Appended to Losada's second federal petition was an affidavit by Peña which states:

> "On or about April 3, 1985, I received notice from the 197th Judicial District, Cameron County, Texas, to

6

represent Rafael Leyva in Cause No. 85-CR-244-C.  The arraignment on said cause was set for April 11, 1985 at 1:00 p.m.  Prior to the day of the arraignment, I visited with Rafael Leyva at the Cameron County Jail Infirmary, and interviewed Leyva about the case.  On the day of arraignment, I was advised that Horacio Barrera, would be representing Rafael Leyva, in said cause.  Thereto I proceeded to leave the courtroom, as I was leaving the courtroom, Raul Martinez, Administrative Assistant to the 197th District, called me back and advised me that I would be representing Davis Losada in Cause No. 85-CR-224-C."

The district court granted the stay of execution over respondent's objection.  Respondent appealed the grant of the stay to this Court which, on March 22, 1990, affirmed the grant of stay and remanded to the district court for further proceedings.  *Losada v. Collins*, 899 F.2d 13 (5th Cir. 1990)(table).  Following remand, the State filed an answer and motion for summary judgment on August 6, 1991.  The motion for summary judgment urged, *inter alia*, that no actual, as opposed to hypothetical or speculative, conflict of interest on attorney Peña's part was shown, there was no simultaneous representation or joint fee arrangement, another attorney had negotiated Leyva's plea agreement with the prosecution, and no area of inquiry or cross-examination of Leyva which Peña should have, but did not, pursue was identified.  The record reveals that no response to this motion was filed by or on behalf of Losada.  After the State's motion for summary judgment had been pending without response for nearly one and a half years, the district court, on December 16, 1992, entered a memorandum opinion and order denying Losada's petition for habeas relief.

7

With regard to the ineffective assistance of counsel claim, the district court held that Losada failed to demonstrate that Peña was operating under an actual conflict of interest so as to entitle him to a presumption of prejudice under the first prong of *Cuyler v. Sullivan*, 100 S.Ct. 1708 (1980). Relying on this Court's decision in *United States v. Olivares*, 786 F.2d 659, 663 (5th Cir. 1986), the district court observed, "[t]he Fifth Circuit has held that 'active representation of conflicting interests connotes more than merely cross-examining a former client at an earlier stage in the case. . . .'" The district court noted that there had been neither joint representation nor a joint fee agreement as in *Olivares*, and that "[a]t the most Losada alleges that his counsel represented the witness for approximately one week prior to his arraignment, and interviewed him at that time." *Id*. The district court additionally found that:

> "[w]hile counsel's cross-examination of the witness was short at best, Losada does not identify any other avenues of cross-examination that counsel should have, but did not pursue. The record reflects that counsel emphasized the witness' criminal record and, the fact that the witness' initial statement to law enforcement officials discounted his own role in the rape and murder, contrary to his trial testimony. Therefore counsel's short cross-examination may be considered trial strategy. . . ."[1]

After addressing the numerous other errors raised by Losada,

---

[1] The finding by the district court erroneously attributes the State's cross-examination of Leyva to defense counsel. However, because this fact does not alter our conclusion that no actual conflict was demonstrated by Losada, this error is harmless. Fed. R. Civ. P. 61.

the district court denied relief.  Thirty days later, on January 15, 1993, Losada filed a motion to reopen the cause to receive additional evidence and requested an evidentiary hearing.  On the same day, Losada also filed a notice of appeal from the December 16, 1992, order.  Losada sought to submit a second affidavit by Peña dated January 15, 1993, which states in relevant part:

"My representation of Rafael Leyva was brief but detrimental to the petitioner.  I visited Leyva at the infirmary where he was detained for protection purposes. I interviewed Leyva for approximately an hour.  We discussed the purpose of the arraignment, the plea bargain he had been offered and discussed some of the facts.  Leyva and I showed up for arraignment together in court.  I was advised that I had been removed from Leyva's representation and the court had decided to continue with the proviously [sic] appointed counsel who in turn had represented Leyva during certification as an adult.  As I walked out of the court, I recall [sic] back to the courtroom and advised that I had been appointed to represent the petitioner.  I was placed in a situation where I had a legal obligation to represent the Petitioner but I also had an ethical obligation to Leyva, however brief [sic] I had represented Leyva prior to Petitioner's representation.  It was my belief that the court knew better [sic] to have appointed me to represent both defendant [sic] in the same case, knowing one was a "star" witness for the prosecution.  Furthermore, the appointment was done during the arraignment and therefore, the court knew or should have known of the possibility of conflict.  He appointed me, I thought it was fine to represent the petitioner.  During the trial I did not continue to cross-examine Leyva.  I could not cross-examine Leyva without going into what we had discussed during our interview at the detention center. The extent of my attack on Leyva was limited primarily to the closing arguement [sic] and to his testimony on direct by the state.  The Court was aware of my representation of Leyva and the petitioner since the appointment of my representation of the petitioner was during arraignment and in the courtroom.  However brief, the representation of Leyva was detrimental to the Petitioner.  None of our discussions (Leyva) came out during the trial."

9

By order entered September 8, 1995, the district court denied Losada's pending motions and granted a Certificate of Probable Cause. Losada, on September 29, 1995, filed a notice of appeal from the September 8, 1995, order. Losada's two appeals were consolidated in this Court.

## Discussion

In order to be entitled to an evidentiary hearing before the district court, a habeas petitioner must allege specific facts which, if proven, would entitle him to relief. *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 2977 (1993); *Young v. Herring*, 938 F.2d 543, 559-60 (5th Cir. 1991), *cert. denied,* 112 S.Ct. 1485 (1992). "The [habeas] petitioner must set forth specific allegations of fact, not mere conclusory allegations," *Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995), and "[t]he court need not blindly accept speculative and inconcrete claims as the basis upon which to order a hearing," *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir.), *cert. denied*, 110 S.Ct. 419 (1989) (internal quotation marks omitted).

Claims of ineffective assistance of counsel based upon an attorney conflict of interest resulting from joint or serial representation of multiple clients is governed by the presumed prejudice standard of *Cuyler,* 100 S.Ct. at 1717. *See Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995)(*en banc*), *cert. denied,* 116 S.Ct. 1547 (1996). "In order to establish a violation of the Sixth

10

Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 100 S.Ct. at 1718; *see also, Strickland v. Washington*, 104 S.Ct. 2052, 2067 (1984); *Burger v. Kemp*, 107 S.Ct. 3114, 3120 (1987). The mere "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler*, 100 S.Ct. at 1719. An actual conflict arises when an attorney "actively represent[s] conflicting interests," *id*; *United States v. Garcia*, 77 F.3d 857, 860 (5th Cir. 1996), *petition for cert. filed*,(June 17, 1996)(No. 95-9374), or put differently, "when an attorney represents two clients whose interests in the outcome of a matter are different." *Perillo v. Johnson*, 79 F.3d 441, 447 (5th Cir. 1996). "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 100 S.Ct. at 1719.

The adverse effect prong of the *Cuyler* standard requires a lesser showing "than the outcome-determinative prejudice standard" of *Strickland*. *United States v. McCaskey*, 9 F.3d 368, 381 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1565 (1994). "[T]o show adverse effect, a petitioner must demonstrate that some plausible defense strategy or tactic might have been pursued but was not, because of the conflict of interest." *Perillo*, 79 F.3d at 449.

In his appellant's brief, Losada, through counsel, argues that

11

he received ineffective assistance of counsel during his state trial because Peña labored under a conflict of interest arising from his brief representation of Leyva prior to Leyva's arraignment. In particular, Losada urges that an actual conflict existed because Peña was unable to adequately cross-examine Leyva without delving into confidences that he received during his brief interview with Leyva prior to Leyva's arraignment.

Indeed, "[i]t is well established [sic] that the defendant is denied effective assistance of counsel in those instances where an attorney is unable to cross-examine, or is chilled in the cross-examination of, a government witness because of the attorney/client privilege arising from counsel's prior representation of the witness or from his duty to advance the interests of the witness as a current client." *United States v. Soudan*, 812 F.2d 920, 927 (5th Cir. 1986), *cert. denied,* 107 S.Ct. 2187 (1987). As the above-quoted passage from *Soudan* suggests, to demonstrate an actual conflict resulting from successive representation of two clients, one of whom is now serving as the state's witness against the other, it must be demonstrated that some confidences passed between the attorney and his former client.[2] Losada fails to make such a

---

[2]     Losada asserts that the law presumes that an attorney receives confidential communications during the course of representing a client. While we have applied such a presumption in the context of motions to disqualify counsel in civil proceedings, *see, e.g., In re American Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir. 1992), *cert. denied,* 113 S.Ct. 1262 (1993), Losada does not cite nor do we find precedent from this Circuit applying such a

12

showing here.

The initial Peña affidavit does not indicate that any confidences passed between Peña and Leyva during the course of the representation. Nor is there any allegation to that effect in Losada's second habeas petition (which incorporated Peña's attached affidavit). Peña's affidavit indicates merely that he was appointed to represent Leyva, "interviewed Leyva about the case" prior to the arraignment, and after being replaced as Leyva's counsel was appointed to represent Losada. That Peña and Leyva discussed the "case" does not tell us, and more importantly did not inform the district court, whether they discussed the facts of the rape-murder as opposed to merely the terms of the plea agreement which Leyva——through counsel (Barrera) other than Peña——had entered into with the state, or the purpose of the arraignment. In short, the affidavit is simply insufficient to reflect that any confidences passed between Peña and Leyva which would create a conflict when Peña was later (after his brief representation of Leyva had terminated) required to cross-examine Leyva at Losada's trial.

Peña's second affidavit more clearly avers: "I did not continue to cross-examine Leyva. I could not cross-examine Leyva without going into what we had discussed during our interview at the detention center." However, this affidavit was not submitted

presumption to claims under the Sixth Amendment.

13

to the district court until January 15, 1993, nearly one month after entry of the order denying habeas relief, and well after the time for filing a motion for new trial. The district court subsequently denied the motion to reopen to consider this affidavit and to set aside its December 16, 1992, order.

A district court's denial of a Rule 60(b) motion is reviewable only for abuse of discretion. *See, e.g., Government Fin. Serv. One Ltd. Partnership v. Peyton Place, Inc*., 62 F.3d 767, 770 (5th Cir. 1995). Treating Losada's motion as one under Rule 60(b)(2) seeking relief from the judgment on the grounds of newly discovered evidence, we find no such abuse of discretion here. There is certainly nothing to suggest that the second Peña affidavit constitutes newly discovered evidence at all. The first Peña affidavit demonstrates that Peña was clearly available to Losada long before the dismissal of his habeas petition. *See Behringer v. Johnson*, 75 F.3d 189, 190 (5th Cir.)(habeas petitioner's evidence not newly discovered where knew factual basis of claim prior to filing petition, and neither presented claim nor asserted that witness unwilling to provide an affidavit), *cert. denied,* 116 S.Ct. 1284 (1996). Furthermore, a movant under Rule 60(b)(2) is required to demonstrate that due diligence was exercised in obtaining the newly discovered evidence. *Id*. at 771; *New Hampshire Ins. Co. v. Martech USA*, 993 F.2d 1195, 1200-01 (5th Cir. 1993). Losada's motion offers no explanation whatever for the failure to obtain and

14

submit the second Peña affidavit earlier in these proceedings other than that some of the research duties had been assigned to assisting counsel of record, and counsel's belief (not assertedly induced by anything done by the district court or the state) that an evidentiary hearing would be scheduled pursuant to this Court's 1990 remand. If anything, the reasons proffered in support of the motion tend to demonstrate a lack of diligence on the part of counsel in submitting the second affidavit. After the State's motion for summary judgment had been pending for nearly a year and a half without response from Losada, the district court was entitled to assume that none was forthcoming. We cannot say on these facts that the district court abused its discretion in denying Losada's January 15, 1993, motion, and accordingly the second Peña affidavit was not before the district court.[3]

---

[3] Even if we were to consider the second Peña affidavit, we would ultimately reach the same result as Losada is unable to demonstrate any adverse effect which Peña's asserted conflict of interest had upon his representation. Although the second Peña affidavit states that, "I could not cross-examine Leyva without going into what we had discussed during our interview at the detention center," and that "[h]owever brief, the representation of Leyva was detrimental to the petitioner," these statements are wholly conclusory, and there is no indication of either the nature of the confidences or of what areas of cross-examination of Leyva they allegedly precluded. As this Court only recently held in *Perillo*, "to show adverse effect, a petitioner must demonstrate that some plausible defense strategy or tactic might have been pursued but was not, because of conflict of interest." *Perillo*, 79 F.3d at 449.

Losada first argues that the attorney/client privilege itself prevents him from demonstrating any adverse effect because he is unable to ascertain what additional avenues of cross-examination conflict-free counsel might have pursued without being privy to the very information cloaked by the privilege. This argument reflects

15

The mere fact of multiple, much less serial, representation alone does not establish an impermissible conflict of interest. *See Cuyler*, 100 S.Ct. at 1718; *see also, United States v. Rico*, 51 F.3d 495, 508 (5th Cir.)(joint representation does not necessarily create conflict of interest), *cert. denied,* 116 S.Ct. 220 (1995). Having failed to demonstrate that any confidences passed between Leyva and Peña, the facts alleged in the affidavits submitted in

---

a misunderstanding of *Perillo*. Losada is not required to come forward with specific information possessed by Leyva which would exculpate him, but only to identify some strategy or theory which was foreclosed to Peña as the result of his prior representation of Leyva. Neither in his brief nor at oral argument was counsel for Losada able to identify any such theory.

Losada additionally argues that "Peña did not test Leyva's credibility with his prior inconsistent statements or his protective custody status or his many other arrangements with the State prosecution team and judiciary." However, none of these matters were privileged as they had already been placed before the jury during the state's direct examination in an effort to "insulate" Leyva on cross-examination. Because these matters were not privileged, it follows that Peña's prior representation of Leyva in no way prevented him from thoroughly cross-examining Leyva in order to bring his credibility into question. Not only were these facts clearly placed before the jury, but Peña attacked Leyva's credibility extensively in closing argument on these very grounds.

When pressed at oral argument, Losada's counsel argued that Leyva had testified at Cardenas' trial that Losada had not told him to strike Perales, but that the others did. Losada's counsel noted that this was inconsistent with Leyva's testimony at Losada's trial in which he indicated that "all" of the others had told him to strike Perales with the pipe. Losada's counsel argues that this inconsistency could have been brought out under proper cross-examination. However, the record of the Cardenas trial was never submitted at any stage of this proceeding despite the fact that Cardenas' trial was held long before the current federal habeas petition was filed. *See Cardenas v. State*, 730 S.W.2d 140 (Tex. App.--Corpus Christi 1987, no pet.)(direct appeal of Cardenas' conviction in 1987).

16

support of Losada's claim present only a potential, as opposed to an actual, conflict of interest. Such allegations warrant neither an evidentiary hearing, *see Jernigan, supra*, nor other habeas relief.

That a conflict does not necessarily inhere in very instance of serial representation similarly undermines Losada's claim that the state trial court failed in its duty to inquire as to the existence of a possible conflict of interest.  The Supreme Court explained the limited nature of the state court's duty in *Cuyler* as follows:

> "*Holloway* requires state trial courts to investigate timely objections to multiple representation.  But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case.  Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.  Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist . . .Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." *Cuyler*, 100 S.Ct. at 1717 (footnotes omitted).

Assuming, without deciding, that this limited inquiry duty even applies to cases of serial as opposed to multiple representation, we find nothing in the record here which constitutionally mandated such an inquiry by the state court.  It is undisputed that there was no objection at trial.  Nor can we accept Losada's argument that the fact that the trial court made both appointments and that

17

the appointments appeared on the docket sheet should have triggered such an inquiry.  These facts simply reflect Peña's successive representation of Leyva and Losada, and do not necessarily suggest a conflict of interest.  Furthermore, we have held in an analogous situation that where a federal district court fails to inquire into the possibility of a conflict of interest in cases of joint representation as required by Federal Rule of Criminal Procedure 44(c), we will not find reversible error where the record does not reflect an actual conflict of interest as in the present case. *United States v. Holley*, 826 F.2d 331, 333 (5th Cir. 1987), *cert. denied*, 108 S.Ct. 1222 (1988).

Accordingly, the judgment of the district court is hereby

AFFIRMED.